# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: October 06, 2023

Mr. Philip Lee Ellison
Outside Legal Counsel
P.O. Box 107
Hemlock, MI 48626

Mr. B. Thomas Golden
Mr. Brian Kenneth McLaughlin
Mr. James Alan Ziehmer
Office of the Attorney General
of Michigan
P.O. Box 30754
Lansing, MI 48909

Re: Case No. 22-1780, *Dennis O'Connor v. Rachael Eubanks, et al*
Originating Case No. : 1:21-cv-12837

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0225p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

DENNIS O'CONNOR, and all those similarly situated,
    *Plaintiff-Appellant*,

*v.*

RACHAEL EUBANKS, in her personal capacity; TERRY STANTON, in his personal capacity; STATE OF MICHIGAN,
    *Defendants-Appellees*.

No. 22-1780

---

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:21-cv-12837—Nancy G. Edmunds, District Judge.

Decided and Filed: October 6, 2023

Before: MOORE, THAPAR, and NALBANDIAN, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:** Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellant. James A. Ziehmer, Brian McLaughlin, B. Thomas Golden, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

The court issued a PER CURIAM opinion. THAPAR, J. (pp. 8–14), delivered a separate concurring opinion.

---

**OPINION**

---

PER CURIAM. When Michigan took custody of Dennis O'Connor's property under its unclaimed property laws, it did not acquire title outright. As a result, O'Connor retained certain

rights, including those to just compensation and pre-deprivation process. But once O'Connor filed for compensation, a dispute over these rights arose. Michigan reimbursed O'Connor for the original value of his property, but not for any net interest earned after its liquidation. And according to O'Connor, Michigan failed to provide him with pre-deprivation process. So, he sued the State and two officials in their personal capacities, alleging violations of the Fifth and Fourteenth Amendments. The district court dismissed O'Connor's case with prejudice, holding that the employees were entitled to qualified immunity and the State was entitled to sovereign immunity.

As to O'Connor's claims against the officials, we affirm in part and vacate in part. The officials are entitled to qualified immunity on O'Connor's taking claims but not his due process claims. And while the district court correctly dismissed O'Connor's claims against the State, it should not have dismissed them with prejudice.

I.

In Michigan, the Uniform Unclaimed Property Act ("UUPA") governs unclaimed property. Under UUPA, the State may take custody—not ownership—of unclaimed property after complying with the statute's procedural requirements. *See* Mich. Comp. Laws §§ 567.223(1); 567.238; 567.240(1). The State then holds the property "in trust for the benefit of the rightful owner." *Flint Cold Storage v. Dep't of Treasury*, 776 N.W.2d 387, 393 (Mich. Ct. App. 2009).

The State does not hold the property in its original form for long. After publishing required notices, the State sells or liquidates the unclaimed property within three years of receiving it, unless the owner brings a valid claim to recover the property beforehand. Mich. Comp. Laws § 567.243(1). Then Michigan deposits the proceeds into its general fund, subtracting reasonable administration costs. *Id.* § 567.244(1)-(2). At this point, the owner can no longer reclaim his property, but he can still recover the "net proceeds" from its sale. *Id.* § 567.245(3). To that end, the State maintains a fund to satisfy UUPA claims. *Id.* § 567.244(1).

UUPA also permits owners to recover the interest earned on their property, but only if their property accrued interest before the State took custody of it. So for property like stocks and

interest-bearing accounts, the state administrator must pay owners "any dividends, interest, or other increments realized or accruing on the property at or before liquidation." *Id.* § 567.242. Owners are also entitled to post-liquidation interest on the property's proceeds—but again, only if the property was interest-bearing in the first place. *Id.* § 567.245(3). If the property did not accrue interest before the State took custody, UUPA does not require the State to pay the owner any interest.[1]

Under these provisions, FMC Corporation and Michigan Millers Mutual Insurance Company delivered O'Connor's properties—two checks collectively worth no more than $350— to the State after he failed to claim them. Shortly after, the State liquidated them.

Eventually, O'Connor discovered the taking and filed a claim for compensation. All agree that after receiving this claim, the State reimbursed O'Connor for the value of his property, but not any post-liquidation interest. O'Connor also alleges that neither the State nor the third-party holders provided him with the statutorily required notices.

So O'Connor sued the State in federal court. He also sued two Michigan officials in their personal capacities: Rachael Eubanks, the State Treasurer; and Terry Stanton, the State Administrative Manager of the Unclaimed Property Program. In his complaint, O'Connor claimed the Defendants violated the Fifth and Fourteenth Amendments by denying him—and a potential class of Michigan property owners—just compensation and due process. He sued Eubanks and Stanton under 42 U.S.C. § 1983 and the State directly under the Fifth Amendment.

The Defendants moved to dismiss, claiming the officials were entitled to qualified immunity and the State was entitled to sovereign immunity. The district court granted the Defendants' motion and dismissed all claims with prejudice. *O'Connor v. Eubanks*, No. 21-12837 (NGE), 2022 WL 4009175, at *1, 5 (E.D. Mich. Sept. 2, 2022); R. 29, Pg. ID 387 (judgment). O'Connor timely appealed.

---

[1]All agree that UUPA does not provide for interest payments on O'Connor's property, as it bore no interest when the State took it. Nevertheless, O'Connor has a constitutional right to any net interest earned post-liquidation, as discussed *infra*, Section II.B.

II.

We first consider O'Connor's claims against the officials. Qualified immunity protects Eubanks and Stanton unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (cleaned up). Since this case reaches us after a motion to dismiss, we review the facts in the light most favorable to the plaintiff and decide whether "it is plausible that an official's acts violated the plaintiff's clearly established constitutional right." *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 563 (6th Cir. 2011).

Addressing O'Connor's takings and due process claims in turn, we conclude that the officials are entitled to qualified immunity on the former claims but not the latter.

A.

The Fifth Amendment's Takings Clause provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. In his complaint, O'Connor alleges that the officials violated the Takings Clause. But under circuit precedent, Eubanks and Stanton are entitled to qualified immunity on these claims. *See Sterling Hotels, LLC v. McKay*, 71 F.4th 463, 468 (6th Cir. 2023). Earlier this year in *Sterling Hotels*, we held that individual liability for takings claims is not "clearly established." *Id.* ("[N]o court in this circuit had yet decided whether an officer could be liable for a taking in his individual capacity . . . and at least one case suggested the contrary.") (citing *Vicory v. Walton*, 730 F.2d 466, 467 (6th Cir. 1984)). Thus, we granted qualified immunity to an official sued in his individual capacity. *Id.* Because Eubanks and Stanton are also being sued in their individual capacities for takings claims, they are entitled to qualified immunity under *Sterling Hotels*.[2]

B.

Next, O'Connor claims that Eubanks and Stanton violated his right to due process. The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or

---

[2] O'Connor attempts to distinguish this case from *Sterling Hotels*, but the latter sets a clear rule: qualified immunity bars individual liability for takings claims under 42 U.S.C. § 1983.

property, without due process of law." U.S. Const. amend. XIV. To plausibly allege a due process violation, O'Connor must first establish that he had a right in the deprived property. *See, e.g.*, *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Then, he must show that the State failed to provide sufficient process. *See id.*

First, we must determine whether O'Connor had protected property rights. Neither party disputes that O'Connor has a right in his principal. But the parties disagree over whether O'Connor has a right to interest.[3] Precedent clearly establishes that he does. When the government takes custody of private property and earns interest on it, that interest belongs to the owner. *City of New Orleans v. Fisher,* 180 U.S. 185, 197 (1901). The Supreme Court has reaffirmed this rule time and again. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161-62 (1980); *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 172 (1988). This is true even when the principal was not interest-bearing at the time the state took custody. *See Webb's*, 449 U.S. at 156-57 (noting the principal was cash proceeds from an asset sale). Specifically, the Court has held that owners have a right to the net interest on their principal— that is, the interest accrued less reasonable administrative costs. *Cf. Brown v. Legal Found. of Wash.*, 538 U.S. 216, 238-39 n.10 (2003) (finding no takings violation when the earned interest could not have exceeded the administrative costs and fees).

As these cases clearly establish, O'Connor has a property right in his net interest. To be sure, we do not yet know if O'Connor's property accrued interest or if Michigan incurred costs. But, at this stage of the proceedings, we rely on O'Connor's complaint. And his complaint plausibly alleges his right to net interest. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Because O'Connor has a property right, the State must comply with the Due Process Clause before depriving him of it. Here, O'Connor alleges the State provided him "*no* process whatsoever." Appellant's Br. 31. The officials do not contest this allegation, nor is the allegation implausible. Nothing in the complaint indicates that FMC Corporation, Michigan

---

[3]This question has implications for available damages. If O'Connor has rights only to his principal, he would be limited to nominal and punitive damages, since the State has already reimbursed him for the principal.

Millers Mutual Insurance Company, or Michigan issued any notice before the State took custody of his property or liquidated it.[4]

This presents a problem for the officials. Precedent clearly establishes that the government must give at least *some* notice before taking property. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950). But here, O'Connor alleges the government provided none. Thus, assuming O'Connor's allegations are true, he plausibly alleges a violation of his clearly established right to notice and process.[5]

Eubanks and Stanton dispute this. They argue O'Connor has no rights in any interest because UUPA deems his principal abandoned. *See* Mich. Comp. Laws § 567.223(1). But this argument misses the point. Before the State can extinguish O'Connor's title in "abandoned" property, it must give him "the full procedural protections of the Due Process Clause." *Texaco, Inc. v. Short*, 454 U.S. 516, 534 (1982). And since O'Connor alleges the State provided no process, abandonment is no defense at this stage of the case.

Thus, Eubank and Stanton are not entitled to qualified immunity on O'Connor's due process claims. We vacate the dismissal of those claims and remand for further proceedings.

III.

Lastly, O'Connor raises takings claims against the State. But circuit precedent holds that "the Eleventh Amendment bars takings claims against states in federal court, as long as a remedy

---

[4]To be sure, UUPA required FMC Corporation and Michigan Millers Mutual Insurance Company to send O'Connor written notice before delivering his property to the State. Mich. Comp. Laws § 567.238(5). And every six months in a statewide newspaper, Michigan had to publish a notice identifying O'Connor by name and instructing him on how to claim his property. *Id.* § 567.239. To top it off, the State had to publish another notice "at least 3 weeks in advance of [its] sale, in a newspaper of general circulation in the county in which the property is to be sold." *Id.* § 567.243(1). But the complaint does not indicate whether any of this happened. For this reason, *Freed v. Thomas* is also inapplicable here. In *Freed*, we noted that courts grant qualified immunity to officials who enforce a properly enacted statute "as written," so long as a court has not previously invalidated the statute. *Freed v. Thomas*, 21-1248, 2023 WL 5733164, at *3 (6th Cir. Sept. 6, 2023). But as noted above, the complaint asserts that O'Connor did not receive notice as required by UUPA.

[5]We do not decide the kind of notice and process that the Due Process Clause requires here. We save that issue for the district court on remand. Similarly, we do not decide here whether UUPA's notice and process requirements would satisfy the Due Process Clause.

No. 22-1780    *O'Connor v. Eubanks, et al.*    Page 7

is available in state court." *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 734 (6th Cir. 2022) (citing *DLX, Inc. v. Kentucky*, 381 F.3d 511, 526–28 (6th Cir. 2004)).

Here, a remedy is available in state court. UUPA expressly provides that "[a] person who is aggrieved by a decision of the administrator . . . may bring an action to establish the claim in the circuit court." Mich. Comp. Laws § 567.247. And the Michigan Supreme Court has adjudicated takings claims against the State under the Fifth and Fourteenth Amendments. *See, e.g.*, *K & K Constr., Inc. v. Dep't of Nat'l Res.*, 575 N.W.2d 531, 534, 538–40 (Mich. 1998); *see also Electro-Tech, Inc. v. H.F. Campbell Co.*, 445 N.W.2d 61, 77 n.38 (Mich. 1989) ("Since the obligation to pay just compensation arises under the [C]onstitution and not in tort, the immunity doctrine does not insulate the government from liability."). Our caselaw thus bars O'Connor's claims. And we are required to follow our binding decisions. *See Ladd v. Marchbanks*, 971 F.3d 574, 578-80 (6th Cir. 2020) (holding that our sovereign-immunity precedent survives *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019)).

But it is not all bad news for O'Connor. The district court should have dismissed his claims against the State without prejudice. When courts dismiss for lack of jurisdiction, the general rule is to do so without prejudice. *Ernst v. Rising*, 427 F.3d 351, 367 (6th Cir. 2005) (en banc) (collecting cases). Although this rule has exceptions, the district court did not apply any. Thus, we affirm the district court's dismissal but vacate it to the extent that it was with prejudice. *See Carmichael v. City of Cleveland*, 571 F. App'x 426, 435, 437 (6th Cir. 2014) (granting identical relief).

IV.

Precedent forecloses O'Connor's takings claims, but his due process claims may proceed. We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

No. 22-1780  *O'Connor v. Eubanks, et al.*  Page 8

---

## CONCURRENCE

---

THAPAR, Circuit Judge, concurring. The Takings Clause sets "a simple, *per se* rule: The government must pay for what it takes." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). But what happens when the government doesn't? Usually, you'd go to court. Yet our circuit has closed the federal courthouse doors on takings claims. First, in *Vicory*, we arguably foreclosed claims against officials. *Vicory v. Walton*, 730 F.2d 466 (6th Cir. 1984). Then, in *DLX*, we shielded states from suits in federal courts. *DLX, Inc. v. Kentucky*, 381 F.3d 511 (6th Cir. 2004). Sometimes, a plaintiff can find a municipality to sue for a taking. But other times, as here, there aren't any involved. In these cases, the only remedy is in state court. Neither federal law nor the Constitution dictates this odd result—and recent Supreme Court precedent rejects it. *See Knick v. Township of Scott*, 139 S. Ct. 2162, 2171 (2019).

I write separately to make four points about *Vicory*. First, *Vicory*'s focus on individual liability supplies the wrong inquiry for qualified immunity. Under the "clearly established" prong, we should ask "what happened," not "whom can you sue." Second, despite what *Vicory* suggests, our constitutional history establishes a strong tradition of takings suits against individual officials. Third, when we combine *Vicory* with our sovereign immunity precedent in *DLX*, we effectively require parties to litigate takings claims in state court. And that requirement directly conflicts with the Supreme Court's decision in *Knick*. Finally, it's unclear that *Vicory* is actually controlling.

Eubanks and Stanton are off the hook for O'Connor's takings claim. But in the future, our circuit can and should permit takings claims against officials.

I.

Today's decision correctly applies *Vicory* and *Sterling Hotels* to O'Connor's takings claims. In *Vicory*, this court couldn't find any cases "suggest[ing] that an individual may . . . be liable in damages" for takings violations. 730 F.2d at 467. And in *Sterling Hotels*, the defendant cited *Vicory* in arguing that personal liability for takings claims is not "clearly established."

*Sterling Hotels, LLC v. McKay*, 71 F.4th 463, 468 (6th Cir. 2023). Deferring to the parties' framing of the issue, the *Sterling Hotels* court agreed and granted immunity. *Id.* Thus, because O'Connor brought takings claims against Eubanks and Stanton in their personal capacities, they're immune under *Vicory* and *Sterling Hotels*.

There's just one problem: this approach asks the wrong question. We should first ask whether a cause of action exists against the official. Then, we should ask if that official's conduct violated clearly established law. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). The facts of this case make that distinction clear. Under our typical approach, we'd first ask if there's a cause of action against Eubanks and Stanton. Then we'd ask if Eubanks and Stanton's failure to compensate O'Connor violated his clearly established rights. But the parties in *Sterling Hotel* framed the question differently: they asked whether a suit against individual officials is a clearly established remedy for takings violations. That's the wrong inquiry.

II.

Of course, the question of "whom can you sue" still matters. After all, qualified immunity is irrelevant if there's no cause of action. And *Vicory* suggests there isn't one against individual officials. 730 F.2d at 467.

*Vicory* got it wrong. Start with the text of the Fifth Amendment. Under it, not all takings for public use are unconstitutional. It's only those without just compensation. U.S. Const. amend. V. But what did "just compensation" look like at the founding? And what remedies were available when the government failed to provide compensation?

At the federal level, early Congresses usually provided for "just compensation" in the statutes authorizing takings. A statute reorganizing the municipal government in Georgetown, D.C. (now a part of Washington) is an illustrative example. Under that statute, the government could build and extend streets within the city. Act of March 3, 1805, ch. 32, § 12, 2 Stat. 332, 335. But the municipality had to give "just and adequate" compensation to those who suffered property loss as a result. *Id.* How would this amount be determined? A justice of the peace would empanel a jury of twenty-three men who would vote on the amount to be repaid. *Id.*; *see also* Act of Feb. 25, 1804, Ch. 15, § 5, 2 Stat. 255, 257 (analogous provisions for Alexandria,

D.C.).  Congress authorized similar compensation mechanisms for other public projects.  *E.g.*, Act of March 3, 1809, Ch. 31, § 7, 2 Stat. 539, 541 (providing for appraisal, voluntary agreement, or jury valuation to compensate property owners aggrieved by the construction of a turnpike through Alexandria).

But what happened when the government failed to provide compensation?  Early practice under analogous state protections offers insight.  *Cf. District of Columbia v. Heller*, 554 U.S. 570, 600–01 (2008) (relying on state analogs to interpret the Second Amendment).  Long before the federal Takings Clause applied to states, many states added takings clauses to their own constitutions.  *See, e.g.*, Vt. Const. of 1777, ch. I, art. II; Mass. Const. of 1780, art. X.  And in other states, courts imposed a just compensation requirement as a matter of "natural equity."  Akhil R. Amar, *The Bill of Rights: Creation and Reconstruction* 150 n.\* (1998) (collecting cases); *see, e.g.*, *Young v. McKenzie*, 3 Ga. 31, 44 (1847) (holding that the Takings Clause simply recognized a preexisting principle that applied to all republican governments).  These analogs shed light on early takings remedies.

State takings clauses functioned like other constitutional limits on the government: statutes and official actions that violated a constitutional provision were unenforceable.  *See VanHorne's Lessee v. Dorrance*, 2 U.S. (2 Dall.) 304, 316 (C.C.D. Pa. 1795) (Patterson, J.) (finding that a state statute was of no "virtue or avail" in the case because it failed to provide compensation for a taking).  This meant that an uncompensated taking was unlawful, since any statutes authorizing the taking wouldn't have been enforceable.  *See Thacher v. Dartmouth Bridge Co.*, 35 Mass. (18 Pick.) 501, 502 (1836) (noting that a statute granting the power to take property without compensation couldn't justify what is otherwise a trespass).

And if an official took property unlawfully, the aggrieved party had remedies against him at common law.  This often took the form of a trespass action against the official.[1]  In some

---

[1] *See, e.g.*, *Stevens v. Proprietors of Middlesex Canal*, 12 Mass. (11 Tyng) 466, 468 (1815) (noting that if a state passed a law diminishing the value of private property without indemnifying owner, the owner would "undoubtedly have his action at common law, against those who should cause the injury"); *Jerome v. Ross*, 7 Johns. Ch. 315 (N.Y. Ch. 1823) (noting that a legislature's failure to include a compensation mechanism did not preclude owner from bringing a claim against the commissioners for damages); *Bates v. Cooper*, 5 Ohio 115, 115 (1831) (suing canal superintendent for trespass when the authorizing statute allegedly violated the state's takings clause).

No. 22-1780                    *O'Connor v. Eubanks, et al.*                    Page 11

cases, the aggrieved party could even enjoin the official from further takings.**2** Importantly, the defendants in these cases couldn't raise statutory authorization as a defense. Statutes authorizing uncompensated takings were unconstitutional, and an unconstitutional statute was no defense. *Thacher*, 35 Mass. at 502; *Knick*, 139 S. Ct. at 2175–76 (citing Robert Brauneis, *The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law*, 52 Vand. L. Rev. 57, 69–70, 69 n.33 (1999)). So if a state took property without compensation, the relevant officials were on the hook for damages.

Thus, in the early decades of our republic, lawsuits against officials were a viable remedy for takings. Indeed, because states enjoyed sovereign immunity, suits against officials were among the *only* takings remedies for most of the nineteenth century. Brauneis, *supra*, at 72-78; *see also Knick*, 139 S. Ct. at 2176 (noting there weren't statutory or implied-constitutional-tort remedies for takings until the 1870s). Because the *Vicory* line of cases says otherwise, it's inconsistent with our constitutional history.

III

If that doesn't give us enough reason to reconsider *Vicory*, its combined impact with *DLX* should. When a state official takes someone's property without compensation, two obvious defendants come to mind: the official who committed the taking, and the state. Yet our precedent forecloses suits against either defendant in federal court. *Vicory* prevents claims against officials. And *DLX* bars claims against the state in federal court. *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 734 (6th Cir. 2022) (citing *DLX*, 381 F.3d at 526–28). Thus, unless there's a municipality to sue, plaintiffs must litigate takings claims in state court.

If this rule sounds familiar, that's because it's not new. It's a version of the "state-litigation" rule. More importantly, it's a rule the Supreme Court deemed "wrong" and "exceptionally ill" just four years ago. *See Knick*, 139 S. Ct. at 2178. In *Knick*, the Court

---

**2***See, e.g.*, *Gardner v. Village of Newburgh*, 2 Johns. Ch. 162 (N.Y. Ch. 1816) (enjoining the individual trustees of Newburgh from diverting plaintiff's water supply when owner was not sufficiently compensated); *Cooper v. Williams*, 4 Ohio 253 (1831) (seeking injunction against an individual commissioner for taking water rights for an allegedly non-public use); *Parham v. Justs. of Inferior Ct. of Decatur Cnty.*, 9 Ga. 341 (1851) (enjoining individual road commissioners from constructing roads when no compensation had been provided).

rejected the idea that a plaintiff had no remedy in federal court until a state court denied him compensation. *Id.* at 2179. To hold otherwise, the Court noted, would "relegate[] the Takings Clause to the status of a poor relation among the provisions of the Bill of Rights." *Id.* at 2169. Indeed, the Justices have repeatedly recognized that the state-litigation rule is "at odds with the plain text and original meaning of the Takings Clause." *Arrigoni Enterp. v. Town of Durham*, 136 S. Ct. 1409, 1409 (2016) (Thomas, J., dissenting from denial of certiorari). So we should stop enforcing it.

To be sure, our precedent doesn't impose a state-litigation rule in so many words. But together, *DLX* and *Vicory* get us pretty close. Unless a municipality is available as a defendant— and as this case shows, that's not always the case—plaintiffs are stuck litigating in state court. At best, plaintiffs can sue the state in federal court if remedies aren't available in state court. *See Skatemore*, 40 F.4th at 734. But *Knick* expressly rejected that kind of arrangement: "The availability of any particular compensation remedy . . . under state law, cannot infringe or restrict" an owner's right to pursue a remedy in federal court. 139 S. Ct. at 2171. The Supreme Court shattered the state-litigation rule in *Knick*. Our circuit shouldn't piece it back together with *Vicory* and *DLX*.

IV.

If all that's not enough, I'll offer one more reason why we shouldn't follow *Vicory*: I don't believe it's binding. First, as *Sterling Hotels* recognized, *Vicory* merely "suggested" that there's no individual liability for takings violations. 71 F.4th at 468. And suggestions aren't law.

Second, *Vicory* was an order denying rehearing en banc. In other words, it was a refusal to reconsider a case's merits—not a ruling on the merits themselves.[3] Admittedly, the panel that originally heard the case added a statement to the order. And in that statement, the panel claimed that officials can't be individually liable for takings violations. But when circuit judges write these statements, they aren't binding on the court. *Shepherd v. Unknown Party*, 5 F.4th 1075,

---

[3]The question of individual liability for takings violations wasn't before the *Vicory* panel when it originally decided the case. The *Vicory* plaintiff raised that issue for the first time in his rehearing petition. *Vicory*, 730 F.2d at 467. Thus, the *Vicory* court *never* ruled on the merits of that question.

1077 (9th Cir. 2021). A six-judge concurral couldn't bind this court, so the statement in *Vicory*—joined by just two judges—doesn't bind us, either.

V.

Because this court isn't bound by *Vicory*, we should allow plaintiffs to raise takings claims against officials in future cases. But what form would these claims take?

As our constitutional history shows, common law torts against officials are one option. After all, those were the go-to remedies against officials for takings violations at the founding. There's just one issue: unlike at the founding, common law is state law these days. *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). That means states have broad power to abrogate and modify common law remedies, and federal courts are bound to follow their lead. *Id.* But the *Knick* Court made clear that the remedies available under the Takings Clause aren't contingent on the remedies available under state law. 139 S. Ct. at 2171. Thus, common law torts can't be the only remedy against officials for takings violations.[4]

Fortunately, section 1983 offers another option. That statute creates a cause of action against state actors who violate constitutional rights. 42 U.S.C. § 1983. And under the Takings Clause, there's a violation "as soon as" the government takes property without paying for it. *Knick*, 139 S. Ct. at 2170. Thus, when a state official "subjects" a person to an unconstitutional taking, section 1983 can provide a remedy against the official. 42 U.S.C. § 1983; *see also* Cong. Globe. App. 42d Cong., 1st Sess. 85 (1871) (Rep. Bingham) (citing states' failure to adequately compensate takings as a basis for enacting section 1983). At the very least, then, our circuit should permit takings claims against officials under section 1983.

Perhaps our circuit should also allow suits against officials directly under the Takings Clause. There's some historical support for this approach. By the late nineteenth century, state courts began entertaining takings claims that were wholly disconnected from common law trespass. *See, e.g.*, *Reardon v. City & County of San Francisco*, 6 P. 317, 325 (Cal. 1885);

---

[4]This wasn't always a problem. Before *Erie*, a federal court could entertain "general" common law torts against officials who committed unconstitutional takings. And federal courts applying general common law weren't bound by state common law. *Swift v. Tyson*, 41 U.S. 1, 18 (1842), *overruled by Erie*, 304 U.S. at 79. Thus, pre-*Erie*, common law torts didn't violate the *Knick* principle.

Case 1:21-cv-12372-NGE-PTM ECF No. 32, PageID.405 Filed 10/06/23 Page 15 of 16  Case: 22-1780 Document: 32 Filed: 10/06/2023 Page: 15 of 16 (15 of 16)

No. 22-1780                    O'Connor v. Eubanks, et al.                    Page 14

*Harman v. City of Omaha*, 23 N.W. 503, 503 (Neb. 1885). In other words, plaintiffs could sue directly under a state takings clause, independent of any statute or common law action. And as Judge Oldham recently noted in a thoughtful opinion, Supreme Court precedent has repeatedly suggested the same for the federal Takings Clause. *See Devillier v. State*, 63 F.4th 416, 436 (5th Cir. 2023) (Oldham, J., dissenting from the denial of rehearing en banc) (collecting over a century of Supreme Court cases suggesting plaintiffs have a cause of action directly under the Takings Clause), *cert. granted sub nom. Devillier v. Texas*, No. 22-913, 2023 WL 6319651 (U.S. Sept. 29, 2023). Indeed, this circuit previously allowed direct takings claims against municipalities in the days before *Monell*. *See Foster v. City of Detroit*, 405 F.2d 138, 140, 144 (6th Cir. 1968). *But see Thomas v. Shipka*, 818 F.2d 496, 501–03 (6th Cir. 1987) (suggesting section 1983 is the exclusive remedy for constitutional claims after *Monell*), *vacated*, 872 F.2d 772 (6th Cir. 1989). And for good reason. The right to just compensation shouldn't depend on any statute—the Constitution requires it. *See Jacobs v. United States*, 290 U.S. 13, 16 (1933) ("Statutory recognition was not necessary . . . . The suits were thus founded upon the Constitution . . . ."). Perhaps, then, plaintiffs could sue an official directly under the Takings Clause.

There's certainly more to say on this topic, and we need not resolve that question today. For now, it suffices to say this: our circuit ought to abandon *Vicory*. It's inconsistent with our constitutional history, and, when combined with *DLX*, it violates *Knick*. Instead, we should hold that section 1983 provides a cause of action against officials who inflict unconstitutional takings.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-1780

DENNIS O'CONNOR, and all those similarly situated,

    Plaintiff - Appellant,

v.

RACHAEL EUBANKS, in her personal capacity; TERRY STANTON, in his personal capacity; STATE OF MICHIGAN,

    Defendants - Appellees.

**FILED**
Oct 06, 2023
DEBORAH S. HUNT, Clerk

Before: MOORE, THAPAR, and NALBANDIAN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.

    THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

    IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED in part, VACATED in part, and REMANDED for further proceedings consistent with the opinion of this court.

    **ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk